IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ASKIA S. ASHANTI,

        Plaintiff,                No. CIV S-03-0474 LKK GGH P

   vs.

CA. DEPT. OF CORRECTIONS, et al.,

       Defendants.           FINDINGS AND RECOMMENDATIONS

_____/

<u>Introduction</u>

        "What's in a name?  That which we call a rose by any other word would smell as sweet."  Skakespeare, *Romeo and Juliet*, Act II, Scene 2.

        Shakespeare never met plaintiff herein, never read the <u>Malik v. Brown</u> series of cases, and was unfamiliar with RLUIPA.  This case involves plaintiff's quest to have his name changed from his "slave name" to one which he believes better fits his cultural notions and Muslim religion.  The issues here, like many issues in the prison context, are complicated.  Nevertheless, as the analysis shows below, because the prison officials have met plaintiff half-way, and because these officials have demonstrated that the cost of fully complying with plaintiff's desire would place an inordinate burden on a system with plenty of other burdens, defendants are entitled to summary judgment.

1

The Motions

Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. § 1983.  Pending before the court are: defendants' motion for summary judgment, filed on March 14, 2006, to which plaintiff filed "objections," which the court construes as an opposition;[1] and 2) plaintiff's cross-motion for summary judgment, on March 30, 2006.  Plaintiff filed a supplement to his cross-motion, on April 21, 2006, of which he filed a duplicate on May 15, 2006.[2]  The supplement contains copies of certain additional legal documents, i.e., his passport, social security card, a past driver's license, under his changed name, which, while not formally authenticated, also raised no objections from defendants.  Defendants filed an opposition to plaintiff's cross-motion, on May 15, 2006, having been granted two extensions of time.[3]

Plaintiff's Remaining Allegations

The following summary of plaintiff's claims by this court is borrowed from an earlier order:

> Plaintiff's proposed second and third amended complaints have been stricken.  See Orders, filed on August 26, 2004 and June 10, 2005.  The first amended complaint has been modified by Orders, filed on October 1, 2004, and on May 25, 2005.  This matter has proceeded against defendants Woodford and Carey solely in their

---

[1] Although defendants averred that plaintiff had failed to file an opposition to their dispositive motion, plaintiff argued in his reply to defendants' opposition to plaintiff's cross-motion for summary judgment, on May 26, 2006, that his "objections" in that filing constitute his opposition.

[2] In addition, on March 27, 2006, plaintiff objected to the lodging of his deposition transcript, contending that the deputy attorney general failed to notify him that the transcript was complete, thereby not affording him the opportunity to review the transcript to make any changes and to sign it.  Plaintiff includes a copy of the notice defendants' counsel submitted informing the court that the deposition transcript had been lodged; the notice also asserts that excerpts are attached as Exhibit I in support of defendants' motion for summary judgment.  Plaintiff, in his objections to the lodging of his deposition transcript without his review, specifies no objection to the very limited actual text of the transcript (two pages) cited by defendants and attached as an exhibit to their motion.  Although defendants should have submitted the transcript to plaintiff before submitting it, in light of plaintiff's failure to identify any particular error in the transcript that forms part of their exhibits to their dispositive motion, the court will not strike the transcript.

[3] See Orders, filed on April 20, 2006, and May 4, 2006.

2

official capacities, for prospective relief only.  Defendant Woodford is a former Director of the formerly named California Department of Corrections (CDC); she succeeded Roderick Hickman as Agency Secretary of California Department of Corrections and Rehabilitation (CDCR) as an interim appointment. The court now substitutes in, under Fed. R. Civ. P. 25(d), James Tilton, the current Acting Secretary of the California Department of Corrections and Rehabilitation (CDCR) as defendant in place of defendant Woodford and/or Hickman.  Thus, this matter now proceeds for prospective injunctive relief only against defendants Tilton and Carey, in their official capacities.  Plaintiff alleges violations of his rights under the First, Eighth and Fourteenth Amendments.

Plaintiff was previously incarcerated in 1988 under the name Lorenzo Cunningham.  FAC, p. 2.[4]  He was released on parole in 1994, and changed his name legally to Askia Ashanti in September 1994.  Id., & Exh. E-7.  In July, 1995, plaintiff was arrested for his current commitment offense and in April 1996 committed to state prison under the name Askia Ashanti.  FAC, p. 2.  A California Department of Corrections (CDC) prison official refused to change plaintiff's name on his prison records.  Id.  While at Pleasant Valley State Prison, plaintiff filed a grievance which was initially granted at the director's level in May, 1997, directing that plaintiff's name on prison and medical files, mail and visiting files and I.D. cards all be changed to Ashanti.  Id.  In June, 1997, the decision was amended to a partial grant, allowing plaintiff to use Ashanti/Cunningham in the visiting/mail room, but requiring his former name, Cunningham, to be used on all other prison records. Id.

Plaintiff filed a federal lawsuit, which he voluntarily dismissed in order to exhaust administrative remedies on new claims.  FAC, p. 3.  Upon his refiling the grievance, it was initially filed/logged, but was later "illegally dismissed" on the grounds that it was a duplicate grievance.  Id., p. 3.  However, plaintiff's grievance based his new claim on a statute not in existence at the time that he filed his earlier grievance, the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), codified at 42 U.S.C. § 2000cc.  Id.  Thereafter, plaintiff filed a new federal lawsuit.[5]

---

[4] The factual background and claims made by plaintiff have been previously set forth by the court.

[5] Although plaintiff does not identify this case, court records reveal it to be Ashanti v. California Department of Corrections, et al., No. CIV S-02-0475 LKK DAD P. (Judicial notice may be taken of court records.  Valerio v. Boise Cascade Corp., 80 F.R.D. 626, 635 n.1 (N.D. Cal. 1978), aff'd, 645 F.2d 699 (9th Cir.), cert. denied, 454 U.S. 1126 (1981)).

Plaintiff claims that his rights as a Muslim under the First Amendment free exercise of religion clause have been violated by defendants not using plaintiff's new, legally changed name on all his prison records.  FAC, p. 5.  The court has also construed this claim as arising under RLUIPA.  Id; see Order & Findings and Recommendations, p. 4, filed on August 26, 2004, the Findings and Recommendations adopted by Order, filed on October 1, 2004.

Plaintiff also claims that defendants have violated his rights under the Eighth Amendment, subjecting him to cruel and unusual punishment, by forcing him to use a name which is a "badge of slavery."  FAC, p. 6.

Plaintiff also claims that defendants have violated his right to due process by refusing to use his legally changed name on his prison records and by continuing to use his former name when he is currently incarcerated for an offense for which he was committed under his new name.  FAC, pp. 7-8.

Finally, plaintiff alleges that his right to equal protection has been violated by defendants because other prisoners have been allowed to use "second names" on their "second commitments."  FAC, p. 9.

Order, filed on 9/20/06, pp. 1-3.

Defendants' Motion for Summary Judgment

Defendants Woodford (now Tilton) and Carey move for summary judgment on the grounds that: 1) plaintiff's right to the free exercise of religion has not been violated; 2) plaintiff is not entitled to relief under RLUIPA; 3) plaintiff's Fourteenth Amendment rights have not been violated; 4) plaintiff's right to be free from cruel and unusual punishment has not been violated; 5) plaintiff has not demonstrated a violation of his right to freedom of expression. Motion for Summary Judgment (MSJ), pp. 3-14.[6]

Plaintiff's Opposition/Cross-Motion for Summary Judgment

Plaintiff contends that he is currently serving a three-strike, 25 year to life, sentence pursuant to a commitment under his legally changed African-Muslim name, that his

_____

[6] As to this fifth ground, vaguely addressed in defendants' motion, it does not appear to the court that plaintiff has raised a claim based on a right to "freedom of expression" in his amended complaint, nor does he address it in his opposition/cross motion for summary judgment, and the undersigned will not address it further.

4

changed name, Askia Sankofa Ashanti, his legal name on a number of official/legal documents, and that he is entitled to have only that name on all of his CDCR records related to his current sentence on the basis that defendants' failure to use the changed name exclusively violates his constitutional right under the First Amendment to the free exercise of religion; under the Fourteenth Amendment to due process and equal protection; under the Eighth Amendment to not be subjected to cruel and unusual punishment, as well as his rights pursuant to statute permitting a name change and under RLUIPA.  Cross-Motion for Summary Judgment (CMSJ), pp. 30-40.[7]

Defendants' Opposition to Cross-Motion for Summary Judgment

In their opposition, defendants re-affirm the grounds of their own motion for summary judgment and assert that CDCR's policy of permitting plaintiff to use his religious name in conjunction with his prison name comports with federal law.  Defs. Opp. to CMSJ, pp. 1-8.

Plaintiff's Reply to Defendants' Opp. to Cross-Motion for Summary Judgment

Plaintiff, in reply to defendants' opposition to his cross-motion, contends, inter alia, that defendants mis-apply the law to the facts of this case.  Reply, pp. 1-4.

Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Fed. R. Civ. P. 56(c) is met.  "The judgment sought shall be rendered forthwith if . . . there is no genuine issue as to any material fact, and . . .  the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the

---

[7] The court references only the pagination of the court's electronic filing system.

1   nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

2   judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

3   to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment should be entered,

4   after adequate time for discovery and upon motion, against a party who fails to make a showing

5   sufficient to establish the existence of an element essential to that party's case, and on which that

6   party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete

7   failure of proof concerning an essential element of the nonmoving party's case necessarily

8   renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be

9   granted, "so long as whatever is before the district court demonstrates that the standard for entry

10  of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

11          If the moving party meets its initial responsibility, the burden then shifts to the

12  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

13  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

14  (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

15  not rely upon the allegations or denials of its pleadings but is required to tender evidence of

16  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

17  contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

18  106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

19  material, i.e., a fact that might affect the outcome of the suit under the governing law, see

20  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

21  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

22  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

23  nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

24          In the endeavor to establish the existence of a factual dispute, the opposing party

25  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

26  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

1   versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

2   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

3   genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

4   56(e) advisory committee's note on 1963 amendments).

5           In resolving the summary judgment motion, the court examines the pleadings,

6   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

7   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

8   477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts

9   placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S.

10  at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the

11  opposing party's obligation to produce a factual predicate from which the inference may be

12  drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

13  aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

14  party "must do more than simply show that there is some metaphysical doubt as to the material

15  facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

16  nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct.

17  1356 (citation omitted).

18          On September 14, 2005, the court advised plaintiff of the requirements for

19  opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v.

20  Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and

21  Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

22              *Undisputed Facts*

23          A number of the facts set forth by defendants as undisputed, in support of their

24  summary judgment motion, are either expressly affirmed or are simply not addressed/disputed by

25  the plaintiff.  Defendants' Undisputed Fact (DUF) No. 1: in 1988, under the name "Lorenzo

26  Cunningham," plaintiff was sentenced to serve a prison term upon his conviction in San

7

Bernardino Superior Court of two counts of forcible rape and one count of sexual penetration by a foreign object. MSJ, Exh. A, Abstract of J., San Bernardino Superior Court Case RCR13756, Oct. 13, 1988; Exh. C, p. 56 to plaintiff's Opposition (Opp.)/CMSJ. DUF No. 2: in 1996, under the name "Askia Ashanti," plaintiff was sentenced to serve a prison term upon his conviction in Los Angeles Superior Court of one count of felony vehicle theft. MSJ, Exh. B, Abstract of J., Los Angeles Superior Court Case BA118005, April 21, 1996; Opp./CMSJ, p. 57. DUF No. 3: in 1990, plaintiff changed his name from "Lorenzo Renell Cunningham" to "Shaheed Muhammad Al-Jihad." MSJ, Exh. C, Decree Changing Name, May 11, 1990; Opp./CMSJ, p. Exh. C, p. 69. DUF No. 4: in 1994, plaintiff changed his name from "Lorenzo Renell Cunningham" to "Askia Ashanti." MSJ, Exh. D, Decree Changing Name, Sept. 23, 1994; Opp./CMSJ, Exh. C, pp. 64-68. DUF No. 5: the name on the outside cover of plaintiff's central file is Lorenzo Cunningham, and the CDCR Number is D-98935. MSJ, Exh. E, Declaration (Dec.) of Correctional Case Records Manager at CMF-Vacaville I. Sanchez, ¶ 5. DUF No. 6: plaintiff's records contain both the name Lorenzo Cunningham, and Askia Ashanti, and others only contain Lorenzo Cunningham. MSJ, Exh. E ¶ 4; Opp./CMSJ, Part 2, p. 7. DUF No. 7: most of the official departmental documents in plaintiff's central file, contain only the name Lorenzo Cunningham. These documents include official CDCR Chronologicals, Rules Violation Reports, and classification records. MSJ, Exh. E ¶ 6; Opp./CMSJ, Part 2, p. 7. DUF No. 8: plaintiff's central file contains numerous other documents with both of plaintiff's names. For example, correspondence from CDCR officials to plaintiff is generally addressed to plaintiff as "Askia Ashanti, D-98935," or "Ashanti/Cunningham, D-98935." MSJ, Exh. E ¶ 7. DUF No. 9: plaintiff's central file reflects that he was committed to CDCR in 1988, with a CDCR Number of D-98935. MSJ, Exh. E ¶ 8. DUF No. 10: plaintiff's central file reflects that plaintiff paroled in 1994. MSJ, Exh. E ¶ 9; Opp./CMSJ, p. 12. DUF No. 11: plaintiff's central file reflects that plaintiff was recommitted to CDCR in 1996. MSJ, Exh. E ¶ 10; Opp./CMSJ, p. 13. DUF No. 13: plaintiff's central file has only ever listed one original commitment name–Lorenzo Cunningham. MSJ, Exh. E ¶ 12. DUF

8

1   No. 14:  Lorenzo Cunningham is the primary name listed in CDCR's Offender Based

2   Information System, (OBIS).  The OBIS also contains the name Askia Ashanti under the field

3   "also committed as" (ACA).  MSJ, Exh. E ¶ 13.  DUF No. 15: CMF's computer systems track

4   inmates according to their CDCR Number and original commitment name.[8]   MSJ, Exh. E ¶ 14.

5          DUF No. 17: the Offender Based Information System (OBIS) is the Department's

6   statewide automated tracking system for offender information.  Commitment data is entered into

7   OBIS based upon the Abstract of Judgment, Minute Orders and charging documents received

8   from the court.  A record is established for each case number for which an offender is sentenced

9   to prison.  MSJ, Exh. G, Dec. of J. Rodriguez, Chief of CDCR Correctional Case Records

10  Services, ¶ 3.  DUF No. 18: pursuant to the Department Operations Manual (DOM), section

11  73010.6.1, Identifying Data, identifying data on the CDC Form 188, Legal Status Summary, shall

12  include, but is not limited to the assigned departmental identification number (CDCR Number)

13  and the commitment name.  MSJ, Exh. G ¶ 4.  DUF No. 19: pursuant to the DOM, the

14  commitment name shall be recorded as reflected on the original Abstract of Judgment by which

15  the inmate was delivered to the custody of the Department.  If the Abstract contains two or more

16  names, the first name shown shall be used as the commitment name.  If one of the names is

17  documented as the true name, the true name shall be shown as the commitment name.  The

18  original commitment name remains unchanged until the CDCR number is discharged.  Names on

19  subsequent commitment documents which differ from the original commitment name shall be

20  recorded as an "Also Committed As" (ACA) name.  MSJ, Exh. G ¶ 5, attachment A, section

21  73010.6.1, Identifying Data.

22         DUF No. 20: with respect to legal name changes, records of inmates who

23  subsequently receive a court-ordered name change shall continue to use the original commitment

24

25         [8] Plaintiff does take issue with the meaning of "original commitment" vs. "subsequent
26  commitment," but does not dispute that inmates are tracked according to their CDCR number
    and commitment name.  Opp./CMSJ, p. 17.

name, but the new legal name shall be recorded as an ACA, and may be used by the inmate for mail and visiting purposes.  MSJ, Exh. G ¶ 6, attachment A.  DUF No. 21: pursuant to CAL. CODE REGS. tit.xv, § 3294.5, Inmate Name Change, an inmate may obtain a legal name change.  However, the original commitment name of the inmate or parolee shall remain on all departmental records and shall continue to be used on all departmental records until the CDCR number is discharged.  MSJ, Exh. G ¶ 7, attachment B, CAL. CODE REGS. tit.xv, § 3294.5.  DUF No. 22: an inmate's legally changed name will be entered in OBIS under the section "Also Committed As."  Id.  DUF No. 23: an inmate will be allowed to use the new legal name for mail and visiting purposes.  Id.

DUF No. 25: if the inmate paroles, changes his name while on parole, and successfully completes his parole period, he would be discharged from CDCR.  If he then re-offends and is recommitted under the new name, he would be received by CDCR under the new name on the Abstract of Judgment and assigned a new CDCR number, even if the name differs from the name on the Abstract of Judgment from the prior term.  The reasons for this difference is that when the inmate successfully discharges from parole, his central file and CDCR number are closed out and sent to the archives unit as that file is no longer active.  Therefore, when he is recommitted, he receives a new CDCR number and a completely new file.  The commitment received at the time the new CDCR number is issued then becomes his "original" commitment for purposes of the new file name and CDCR number as described in the DOM.  MSJ, Exh. G ¶ 9.  DUF No. 26: the two CDCR numbers would be cross-referenced in OBIS indicating that the inmate had been previously committed to the Department under a different name and with a different number.  MSJ, Ex. G ¶ 10.

DUF No. 28: the Department's OBIS computer is over 25 years old and was designed to track an offender by CDCR number and one commitment name.  Additional ACA names are recorded, but are not searchable for tracking purposes.  MSJ, Exh. G ¶ 11.

\\\\\

1   DUF No. 30: due to the nature of the Department's operations, it is imperative

2   that staff be able to track and locate inmates and parolees at all times.  MSJ, Exh. G ¶ 12.

3   DUF No. 31: plaintiff is listed for mail room services as Ashanti/Cunningham, CDCR Number

4   D-98935.   MSJ, Exh. F, Dec. of B. Williams, CMF Litigation Coordinator, ¶ 4.  DUF No. 32:

5   the mail room records show that plaintiff is permitted to send and receive postal

6   parcels and envelopes under both names.  MSJ, Exh. F ¶ 4.  DUF No. 33. CMF staff know

7   plaintiff as both Ashanti and Cunningham, and address him as such.  MSJ, Exh. F ¶ 5.  DUF No.

8   34: plaintiff's identification card lists only the name Lorenzo Cunningham.  MSJ, Exh. F ¶

9   6.  DUF No. 35: several inmate daily activities at CMF require that the inmate's CDCR number

10  and name match the information on file in the computer.  For example, an inmate's name and

11  CDCR Number are verified before the inmate receives medical services or draws canteen items.

12   MSJ, Exh. F ¶ 7.

13   DUF Nos. 36-37: at CMF, inmates are offered religious accommodations and

14  observances including Friday Jumah service, Ramadan religious observance and religious diets.

15  CMF employs an Iman to provide inmates with religious guidance in the religion of Islam.  MSJ,

16  Exh. F ¶8.  DUF No. 38: an inmate is not prohibited from participating in Muslim services and

17  accommodations based on having a non-religious name. MSJ, Exh. F ¶ 9.  DUF No. 39: CDCR's

18  information needs are not driven through one single integrated system.  Instead, the CDCR

19  Enterprise Information Services team supports multiple computer systems and programs

20  designed to track inmate location and provide other custodial information regarding inmates.

21  These disparate systems are utilized by the Division of Adult Institutions, Parole and Community

22  Services, and Health Care Services Division of the Department.  MSJ, Exh. H, Dec. of Dennis

23  Dearbaugh, Assistant Chief Information Officer, Operations, Enterprise Information Systems

24  (EIS), for the CDCR, ¶ 4.  DUF No. 40: additionally, various institutions maintain local

25  computers and data collection systems as well.  The CDCR contracts with outside vendors to

26  provide services such as community correctional facilities and parole re-entry programs.

1  Information about these outside vendor's information systems and record-keeping practices is not

2  readily available.  MSJ, Exh. H ¶ 4.  DUF No. 41: the Offender Based Information System

3  ("OBIS") was originally implemented in 1976.  It is a mainframe system operating at the Stephen

4  P. Teale Data Center.  It is used primarily by Case Records staff to record inmate commitments

5  and movements and process the work time credit of inmates who participate in the Inmate

6  Work/Training Incentive Program in order to derive an inmate's sentence.  MSJ, Exh. H ¶ 5.

7       DUF No. 42: a total of five ACA's can be entered for each inmate listed in OBIS.

8  A user must request to see an inmate's ACA information as the Department relies on the

9  commitment name and inmate's CDCR number as identifiers.  To do so, the user first enters the

10 commitment name and CDCR identification number.  Once that information comes up, then the

11 user can request to see ACA's or AKA's.  An inmate cannot be identified solely by an ACA or

12 AKA .  MSJ, Exh. H ¶ 6.

13      DUF No. 43: the OBIS would be significantly impacted if it were to have both

14 commitment and legal names as the primary identifiers.  To make such a change would mean

15 virtually every transaction and report would require evaluation and analysis.  MSJ, Exh. H ¶ 7.

16 DUF No. 44: potentially, every OBIS function may have to be modified to accommodate the

17 action requested by this lawsuit.  In subsystems such as time collection, commitment, movement,

18 and parole violator, modifications constitute significant rewrite.  MSJ, Exh. H ¶ 7.

19      DUF No. 45: OBIS provides information to other jurisdictions, from local law

20 enforcement to the federal government. To successfully implement this change throughout OBIS

21 on its interfaces would require approximately four person years of effort or more.  MSJ, Exh. H ¶

22 7.

23      DUF No. 46: the Department's Distributed Data Processing System ("DDPS"),

24 implemented in 1987, consists of eleven separate and distinct applications.  These applications

25 track inmate movements, housing, classification levels, job assignments information, inmate

26 funds, medical information, mental health information, visitors and visits, restitution fines and

orders and canteen inventor and sales.  In addition to the eleven applications, there are numerous

central office and maintenance processes used to support these applications.  Currently, the

DDPS does not track additional names of any kind. The system relies on CDC number and

original commitment name to track offenders.  MSJ, Exh. H ¶ 8.  DUF No. 47: modifying the

DDPS system would be a major undertaking.  To provide the ability to track offenders with an

"also committed as" ("ACA") name would require extensive evaluation and analysis of all DDPS

applications and supporting processes.  MSJ, Exh. H ¶ 9.  DUF No. 48: based on current DDPS

development staff, this modification to DDPS could take from 3 to 5 person years or more to

complete.  It is not possible to estimate the cost of modifying DDPS system exactly at this time

because too many variables are unknown.  MSH, Exh. H ¶ 9.  DUF No. 49: if a modification

were to be made, both headquarters and institutional staff would have to be retrained to use the

changes made to the DDPS so that the DDPS could be utilized.  This retraining would add

additional expenses and loss of staff time.   MSJ, Exh. H ¶ 9.

DUF No. 50: various other PC based systems are maintained by the Institutions

Division field staff.  The bulk of these systems are stand-alone in nature.  These systems are

internally developed within a particular institution, to specifically meet their needs.  MSJ, Exh. H

¶ 10. DUF No. 51: most of these applications were developed in order to correct or add

capabilities not available in the existing OBIS or DDPS and Information Systems Division

supported systems.  It is currently estimated that over 2000 stand alone systems exist in the field.

These systems would have to be analyzed to determine which ones would need to be modified.

Assuming that source code still exists to make the modifications, and that it is possible to make

the modification, a very rough estimate of the time it would take to reprogram these stand alone

systems to accept religious name ACA's would be approximately 6 weeks per system. This effort

would require multiple staff members.  MSJ, Exh. H ¶ 10.

DUF No. 52: the Parole and Community Services Division ("P&CSD") of the

CDCR operates several computer systems independently of other systems.  The largest of these,

13

the Interim Parolee Tracking System ("IPTS"), stores a parolee's aliases and monikers to be entered. Another system maintained by the P&CSD contains information complied from the 64 Interim Parolee Tracking System databases. Parolees' aliases and monikers can be found in that system. They can also be found in the Parolee-At-Large system. The other three systems presently maintained by the P&CSD do not contain aliases and would have to be modified to accept them. MSJ, Exh. H ¶ 11.

DUF No. 53: the Department relies upon an inmate's commitment name and his CDCR number for identification purposes. All of the Department's programs have been developed with this requirement. The overwhelming majority of systems which do accept ACA's and AKA's rely on the inmate's commitment name and his CDCR number as the way to access information about the particular inmate. MSJ, Exh. H ¶ 12. DUF No. 54: an inmate who marries and adopts his or her spouse's name is still designated by his/her commitment name in the computer, with the married name as an AKA. Inmates who have legally changed their names for other non-religious or non-family reasons are afforded the same treatment as all other inmates who have legal name changes. ACA's or AKA's are noted when the system can accept the additional data. They are not noted when the system cannot accept the additional data. MSJ, Exh. H ¶ 13. DUF No. 55: the Department would be adversely affected by shifting its scarce information system resources from basic operations to rebuilding a myriad of systems to accept additional name changes. Changing the Department's three major legacy systems to add the functionality needed to search inmate information by an additional name per CDCR number would require a significant amount of redesign. MSJ, Exh. H ¶ 14.

DUF No. 56: CDCR is in the process of completing a feasibility report to gain project approval to implement a new system of computer record keeping that will have greater functionality than the existing systems and will replace the old systems. Currently, this system is in the development stage, and there is no implementation date available. MSJ, Exh. H ¶ 15. DUF No. 57: plaintiff's medical file and central file contain the ACA, Ashanti. Exh. I, Pl.'s

1  Dep. 30:1-4, Nov. 29, 2005.  DUF No. 58: plaintiff has other inmates refer to plaintiff using his

2  religious name.  Exh. I, 49:19-24.

3         *Disputed Facts*

4         Plaintiff takes issue with DUF No. 12, which states that because plaintiff was

5  never discharged from parole prior to being recommitted, pursuant to Cal. Penal Code § 3000(b),

6  he was not issued a new CDCR number.  Instead, plaintiff was recommitted under the same

7  CDCR number, D-98935, with the name Lorenzo Cunningham, ACA Askia Ashanti.  MSJ, Exh.

8  E ¶ 11.  In DUF No. 24, defendants state that in the case where an inmate paroles, changes his

9  name while on parole, re-offends while on parole, and is subsequently recommitted under the

10 new name the inmate is received by the Department under the "original" commitment name and

11 the original CDCR number which is the name he was first committed under.  The new name

12 would be recorded as an ACA.  The reason for this, defendants maintain, is that the inmate is still

13 under the jurisdiction of the Department and his central file and CDCR number are still active.

14 MSJ, Exh. G ¶ 8.  Plaintiff also seeks to challenge defendants averment, DUF No. 27, that in the

15 case where an inmate who has not discharged from his prior term and CDCR number, re-offends

16 and is recommitted using a different name, the Department cannot change the name on

17 Department records.  Exh. G ¶ 10.

18        It is plaintiff's contention that he served six months in Los Angeles County Jail

19 for a parole violation/revocation after his July, 1995, arrest for the period from July, 1995, until

20 January, 1996, for driving a vehicle without the owner's consent (described by plaintiff as

21 "joyriding") under Cal. Vehicle Code § 10851, before being committed to another state prison

22 term in April, 1996. Opp./CMSJ, p. 16.  However, plaintiff's own documents indicate that, while

23 plaintiff paroled in 1994 on the 1988 conviction, he would not have discharged from parole until

24 5/26/97; following the parole revocation, which apparently added six months to his parole

25 period, he would not have been discharged from parole until 11/22/97.  Opp./CMSJ, Exh. B, pp.

26 48-49.  Plaintiff's argument that he had served his six months for his parole violation by January

of 1996, such that he was not, as he contends defendants aver, dually committed to state prison on a first and second commitment as of April, 1996, would appear to be moot.  Plaintiff takes issue with his designation as a parole violator with a new term because he argues that his six month parole violation term had been served and he was imprisoned only pursuant to his second commitment, under the name Askia Ashanti, on April 21, 1996.  In support of his position, he points to a third level appeal response, a portion of which he included in his exhibits, stating that plaintiff was committed under the name Ashanti, as reflected on the April 21, 1996, Abstract of Judgment, that his name had been properly changed, and the institution was directed to change his name on all of his prison files "inclusive of his C-file, Medical File, Identification Card, and on his visiting and mail files."  Opp., CMSJ, Part 2, p. 3.

This decision was amended, however, on June 3, 1997, wherein, although it was recognized that plaintiff had been committed under the name Askia Ashanti as of April, 1996, plaintiff was found to be "a parole violator originally committed under the name Lorenzo Cunningham."  Opp., CMSJ, Part 2, p. 7.   The decision, as modified, stated that while plaintiff's name change while on parole was proper, he had not discharged from CDC under the original commitment; thus, the original commitment name was to be retained on all departmental records, per regulations.  Id.  Nevertheless, the appeal was partially granted, such that the institution was directed to "use both names, Askia Ashanti and Lorenzo Cunningham, on his visiting and mail record files," while the name, Cunningham, under which plaintiff had been originally committed, would continue to be used on "all departmental records."  Id.  The original appeal grant does go some way to undermine defendants' position that plaintiff cannot have his name change pursuant to the 1996 conviction under the name Ashanti, plaintiff's position that his parole on the 1988, conviction was discharged at the time of his 1996 commitment or that his six-month parole violation term was served is not supportable when plaintiff's own filings indicate that he would not have discharged parole with regard to his 1988 commitment until more than a year and a half after he was imprisoned on the 1996 conviction.

1    Alternatively, plaintiff argues that even if he was committed to prison as a parole

2    violator on his 1988 sentence as well as on his 1996 conviction, that once the parole would have

3    been discharged and his imprisonment arises only from his 1996 conviction under the name

4    Ashanti, that no rule should keep his name from being changed on all of his CDCR files.

5    Plaintiff, stating that defendants have argued that plaintiff must be discharged

6    from parole on the first conviction/sentence, before he may use his legally changed name on a

7    second commitment to prison, can point to no rule or law which would keep prisoners from using

8    a legally changed name if their parole term on the first conviction expires while they served time

9    on both.  Opp./CMSJ, p. 16.  As to DUF No. 16, wherein defendants aver that CMF staff would

10   have difficulty tracking plaintiff if the name on his central file was different from the original

11   commitment name in CMF's computer systems, thus possibly preventing documents from being

12   properly filed in plaintiff's central file and Unit Health Record, presenting a potential security

13   risk (MSJ, Exh. E ¶ 15), plaintiff argues that defendants have a seven billion dollar budget

14   allocated for its computer system which should permit the use of multiple names.  Opp./CMSJ, p.

15   18.  On that basis, he apparently seeks to dispute at least the last portion of DUF No. 29, wherein

16   defendants assert that due to the age of the system and antiquated programming language that it

17   would be cost prohibitive and take years to redesign the system to allow an offender to use more

18   than one name, that the Department reports commitments to other agencies, such as the

19   Department of Justice and Federal Bureau of Investigation, based upon the commitment name

20   and CDCR number.  Changing the name, according to defendants, on an active commitment

21   midstream could cause tracking and identification problems for both CDCR and other law

22   enforcement agencies.  MSJ, Exh. G ¶ 11.  Plaintiff does not clearly set forth the basis for the

23   budget he attributes to the prison's computer system nor does he otherwise provide a factual

24   basis for any argument that changing a name on all records while a sentence is being served

25   would not be cost prohibitive or would not require extensive manhours or burdensome

26   interfacing alterations.

1    *First Amendment*

2        The First Amendment to the United States Constitution provides, inter alia, that

3 Congress shall make no law respecting the establishment of religion, or prohibiting the free

4 exercise thereof. U.S. Const. amend. I. The United States Supreme Court has held that prisoners

5 retain their First Amendment rights, including the right to the free exercise of religion. O'Lone

6 v. Estate of Shabazz, 482 U.S. 342, 348, 107 S. Ct. 2400 (1987). To establish a violation of the

7 free exercise clause, plaintiff must demonstrate "a substantial burden on the observation of a

8 central religious belief or practice....," Hernandez v. Commissioner of Internal Revenue, 490 U.S.

9 680, 699, 109 S. Ct. 2136 (1989), and, in the prison context, that the regulation or policy at issue

10 is not 'reasonably related to legitimate penological interests.'" O'Lone v. Estate of Shabazz, 482

11 U.S. 342, 349, 102 S. Ct. 2400 (1987) (quoting Turner v. Safley, 482 U.S. 78, 89, 107 S. Ct.

12 2254, 2261 (1987)). As compared to RLUIPA, a challenge under the free exercise clause

13 imposes a higher standard on plaintiff and a lower standard on defendant.

14        Any challenge under the free exercise clause requires plaintiff to demonstrate that

15 the regulation impacts a central religious belief or practice, one that is "mandated by his faith."

16 Freeman v. Arparo, 125 F.3d 732, 736 (9th Cir. 1997). See e.g., O'Lone v. Estate of Shabazz,

17 482 U.S. 342, 345, 107 S. Ct. 2400, 2402-03 (finding that Jumah service attendance is

18 commanded by the Koran). While the court does not interpret "mandated by faith" as requiring a

19 written command etched into a tablet or book, it does require evidence that the religion considers

20 the desired practice to be central to its theology. It must be more than a recommended practice

21 else the term "mandated by his faith" loses all meaning.

22              Bryant argues that the defendants have violated his religious rights,
because their refusal to hold full Pentecostal services precludes

23              him from participating in the practices and using the "traditional
instruments" which are specific to his faith and distinct from other

24              Protestant faiths. However, while certain practices and instruments
might be unique to the Pentecostal faith, Bryant has not argued or

25              provided evidence to show that they are mandated by his faith.

26 Bryant v. Gomez, 46 F.3d 948, 949 (9th Cir. 1995) (footnote omitted).

1          Although defendants relegate to a footnote what appears to be a half-hearted

2    argument that plaintiff has not had his name legally changed to "Askia Ashanti,"[9] they have not

3    set forth as an undisputed fact that plaintiff failed to have his name changed legally, and plaintiff

4    has produced evidence that constitutes sufficient indicia of the legality of his name change,

5    including a copy of the order granting the name change, evidence that his changed name is the

6    name he has had on his state driver's license, his social security card, his various school

7    transcripts, his passport, not to mention the 1996 Abstract of Judgment, and defendants

8    themselves aver that the name "Ashanti" has been used by prison officials and is contained in

9    some parts of his central file.  Moreover, in his opposition/CMSJ, plaintiff notes that defendants

10   have previously conceded that the name change was effected properly.  Opp./CMSJ, Exh. D, Part

11   2, p. 7.  The court finds that plaintiff's name change to Askia Ashanti is an undisputed material

12   fact.

13          While defendants point out, and plaintiff concedes, that he earlier petitioned for

14   another name, Shaheed Muhammad Al-Jihad, plaintiff later rejected that name because it was

15   Arab-Muslim rather than African-Muslim in origin and he wished by the Muslim name he chose

16   to reflect his African-American heritage and cultural identity, which he avers is important in his

17   practice of Islam.  Opp./CMSJ, p. 19, Exh. C, pp. 79-83.  His motive in changing his European-

18   oriented name was to reject the name he came by due to the enslavement of his ancestors.

19   Plaintiff correctly asserts that the Ninth Circuit has found that Islamic religious name changes are

20   protected by the First Amendment, citing Malik v. Brown I, 16 F.3d 330, 334 (9th Cir. 1994),

21

22          [9] Defendants in a footnote (MSJ, p. 6, n. 2) attempt to assert that plaintiff's name change
     has not been made legally for his alleged failure to comply with Cal. Code Civ. Proc. 1276(a),
23   apparently by not including the name "Shaheed Muhammad Al-Jihad" on the petition changing
     his name to "Askia Ashanti."   However, documentation submitted sufficiently indicates that the
24   state court has recognized and granted plaintiff's petition to change his name to "Askia Ashanti."
     Moreover, while plaintiff does not so state in a separately filed declaration, in his opposition, he
25   asserts that the state court directed him to document the name change from Cunningham to
     Ashanti, rather than Al-Jihad to Ashanti.  Opp./CMSJ, p. 21.  The court will not further address
26   this state law matter.

1   and Malik v. Brown II, 71 F.3d 724, 727 (9th Cir. 1995).  To defendants' assertion that plaintiff

2   has failed to present evidence of the need to have all of his records maintained under his most

3   recent name change, plaintiff quotes from the Koran in an effort to shore up doctrinal support for

4   his name change.  Opp./CMSJ, p. 20.

5           The court takes no issue with plaintiff's assertions that the name change is

6   important to him.  But the court cannot find in the materials before it that the name change is

7   "mandated by plaintiff's faith."  Indeed, plaintiff's motive to change his name has as much to do

8   with plaintiff's own cultural notions as it does with religion.  The important aspect for this case is

9   that plaintiff is every bit as able to practice his religion, as far as the record is concerned, with his

10  previous name as with his desired name.  While the court has no doubt that plaintiff's new name

11  is at least in part a sincere religious statement of identification with the Muslim faith by plaintiff,

12  it is not mandated.

13          Nothing in Malik v. Brown, 16 F.3d 330 (9th Cir. 1994) [see also the subsequent

14  Malik cases 65 F.3d 149 (9th Cir. 1995) and 71 F.3d 724 (9th Cir. 1995)] requires a finding that

15  a change in name is mandated by the Islam faith.  While certainly important, as Malik points out,

16  the "mandated by faith" requirement of Freeman v. Arpaio, is not met – at least on the present

17  record.  And, plaintiff has the burden to show in these motions that his practice is "mandated."

18          Even if the change in name is mandated, plaintiff still will fail to prevail on his

19  First Amendment claim.  The Supreme Court has determined that when a prison regulation

20  infringes upon a prisoner's constitutional rights, it is an unconstitutional violation only if the

21  regulation is not "reasonably related to legitimate penological interests."  Turner v. Safley, 482

22  U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987); O'Lone, supra, (applying Turner standard to a free

23  exercise of religion claim).  The four factor Turner test is utilized to determine if a prison

24  regulation violated a prisoner's First Amendment rights.  Estate of Shabazz, 482 U.S. at 349-50.

25  "First, there must be a valid, rational connection between the prison regulation and the legitimate

26  governmental interest put forward to justify it, and the governmental objective itself must be a

legitimate and neutral one.  A second consideration is whether alternative means of exercising

the right on which the regulation impinges remains open to prison inmates.  A third consideration

is the impact accommodation of the asserted right will have on guards, other inmates, and the

allocation of prison resources.  Finally, the absence of ready alternatives is evidence of the

reasonableness of a prison regulation."  Allen v. Toombs, 827 F.2d 563, 567 (9th Cir. 1987)

(citing Turner, 482 U.S. at 89-91); see also, Malik v. Brown III, 71 F.3d at 728-729.

   The question before this court is whether the prison regulation that requires that

plaintiff, committed to prison for a new prison term arising from a conviction under a properly

made legal name change, who had not discharged from parole on an earlier 1988 conviction at

the time of his re-imprisonment, and must remain committed under his former name and CDC

number unconstitutionally inhibits plaintiff's First Amendment rights under the free exercise

clause.

   Under the first factor of Turner, in a case where an inmate had a legal name

change to a Muslim name, the Ninth Circuit has found that while "the state has a legitimate

interest in continued use of an inmate's committed name," no legitimate penological interest was

served in preventing the inmate "from using *both* his religious and committed names."  Malik I,

supra, at 334 [emphasis in original].  The use of both names was deemed to be "'a reasonable

middle ground between absolute recognition of plaintiff's Muslim names [sic] and the prison

interests of order, security and administrative efficiency.'"  Id., [internal citations omitted].

   The Malik I court also found that using both the religious and committed names,

as to the second Turner factor, provided "a satisfactory alternative means for an inmate to freely

exercise his religion."  Malik I, supra, at 334.  Applying the third factor under Turner, the court

found that using both names would not "have a significant adverse impact on prison

administration."  Id.; see also Malik III, supra, at 729 ("[t]he burden on the prison is so small that

... there was no legitimate penological interest in preventing use of the religious name with the

committed name on the outgoing mail.")  Finally, as to the fourth Turner factor, the "obvious,

21

1  easy alternative" to a rule permitting only the use of an inmate's committed name indicated that

2  such a rule was "an exaggerated response."  Id.  Thus, the court found that an inmate's free

3  exercise right was violated by a prison regulation that would not permit plaintiff to use both

4  names on correspondence and other documents.  Malik I, supra, at 334.

5         The Ninth Circuit noted that both pre- and post-Turner courts have found that a

6  prison's allowing use of a prisoner's new name in conjunction with the old name accommodates

7  both the prisoner's right to free exercise as well as a "prison's interests in administrative

8  continuity."   Malik II, supra, at 729, quoting Ali v. Dixon, 912 F.2d 86, 90 (4th Cir. 1990).

9         It is undisputed that plaintiff was sentenced to a prison term in 1988, under the

10  name of "Lorenzo Cunningham;" that he paroled in 1994, after which plaintiff had his name

11  legally changed; that in 1995, he was arrested on a parole violation; that he was subsequently

12  convicted, sentenced and returned to prison in 1996, for a conviction under the name "Askia

13  Ashanti," but that at the time he was sent to prison in 1996, his parole period on the 1988

14  conviction had not yet been discharged.  DUF Nos. 1-2, 4, 9-11.  The evidence of plaintiff's

15  having failed to discharge from the 1988 conviction is affirmed, as noted, on documents

16  submitted by plaintiff.  It is also undisputed that plaintiff's prison records contain both names of

17  plaintiff, that most of the official departmental documents contain only the name of Cunningham,

18  that a number of his central file documents, including correspondence from CDCR officials

19  contain documents with the name of Ashanti along with the CDC No. assigned to him in his

20  original prison term, D-98935.  DUF Nos. 6-8.  Moreover, it is undisputed that while Lorenzo

21  Cunningham is the primary name in the CDCR Offender Based Information System, the OBIS

22  contains Askia Ashanti under "also committed as" designation.  DUF Nos. 14-15.  Section

23  73010.6.1 of the DOM,[10] outlines the procedure by which inmates are identified by CDCR.  DUF

24

25         [10]  Section 73010.6.1: "Identifying Data" states, in relevant part, that "[t]he commitment
   name shall be recorded as reflected on the original Abstract of Judgment/Minute Order by which

26  the inmate was delivered to the custody of the Department."  In the case of an Abstract
   containing two or more names, "the first name shown shall be used as the commitment name.  If

1    Nos. 18-20.  CAL. CODE REGS. tit.xv, § 3294.5 governs the procedures for an inmate name change; a

2    new legal name may be used on mail and for visiting.[11]   DUF Nos. 21-23.

3            Plaintiff seeks to dispute DUF No. 24, wherein defendants maintain that when an

4    inmate paroles, changes his name while on parole, re-offends while on parole, and is

5    subsequently recommitted under the new name the inmate is received by the Department under

6    the "original" commitment name and the original CDCR number which is the name he was first

7    committed under; the new name would be recorded as an ACA because the inmate is still under

8    the jurisdiction of the Department and his central file and CDCR number are still active.

9    Plaintiff contends on the one hand that there is no law or rule requiring that he be discharged

10   from parole on one commitment before changing his name and being re-committed with a new

11   name, and on the other that if a prisoner is serving time pursuant to a first and second

12   commitment simultaneously that once the time on the first commitment is served, no rule

13   prevents the prisoner from only having his new name used at that point.  Opp., p. 16.

14            Plaintiff does not identify a genuine issue of a material fact in dispute with regard

15   to whether or not he was still under the jurisdiction of the CDCR as to his 1988 conviction when

16   he had not discharged on parole at the time of his recommitment to state prison in 1996.  As to

17   whether or not he has since been discharged from the earlier conviction while serving his term

18   following his 1996 conviction, while this may be disputable, the only issue raised thereby is

19   _____

20   one of the names is documented as the true name, the true name shall be shown as the
     commitment name.  Names on subsequent commitment documents which differ from the original

21   commitment name shall be recorded as Also Committed As (ACA)....  If the individual is
     received with multiple cases, use the name on the case sentenced the earliest.... Legal name

22   change.  Records of inmates who subsequently receive a court-ordered legal name change shall
     continue to use the commitment name as provided above.  The new legal name shall be recorded

23   as an ACA... and may be used by the inmate for mail and visiting purposes."

24   [11] Under § 3294.5, once a name change is properly effected: "(i) [t]he original
     commitment name of the inmate or parolee shall remain on all departmental records and shall

25   continue to be used on all departmental records.  (j) The new legal name change shall be entered
     into the Offender Based Information System (OBIS) under the section 'Also Committed As.'  (k)

26   The inmate shall be notified to inform all persons who may visit or write him/her that they must
     use the inmate's departmental identification number when using the inmate's new name."

1  whether or not the prison should be tasked with changing the commitment name on all records

2  "midstream" as defendants term it.

3          Defendants seek to demonstrate the distinction between a prisoner still under the

4  jurisdiction of the CDCR as opposed to one who has successfully completed, and thus discharged

5  from CDCR, before being re-committed with a new name.  In the case of having been

6  discharged, the old name and central file and CDCR number have been closed out and archived

7  and, upon recommitment, the inmate receives a new CDCR number and new file, after which and

8  the two CDCR numbers are then cross-referenced in OBIS indicating that the inmate had been

9  previously committed to the Department under a different name and with a different number.

10 DUF Nos. 25-26.  Midstream alterations are an apparent burden to the system because the

11 computer tracking system is antiquated; the change would require adjustments to various other

12 systems with which the CDCR records must interface; tracking would be more difficult; plaintiff

13 is a sex offender whose location, per Cal. Penal Code § 290, must be known to the Department of

14 Justice at all times.  MSJ, pp. 5-6.  With respect to the registration requirements for a sex

15 offender, plaintiff concedes that he has to date only been registered under the name of "Lorenzo

16 Cunningham," but that is only because he was arrested in 1995 before his November 1995

17 registration date, at which he had intended to register under the name of "Askia Ashanti."  That

18 being the case, however, the court observes that plaintiff, himself, is contending that the only

19 name under which he has been registered at two different police departments and with the

20 Department of Justice is his birth name, a consideration that weighs in favor of defendants'

21 safety and security concerns with respect to tracking; on the other hand, plaintiff is currently

22 serving a life sentence, which might render that issue moot.  Opp./CMSJ, pp. 22-23.

23          As to the Turner factors, as to the first factor, that CDCR has a legitimate state

24 interest in properly maintaining its files and tracking individuals within its custody cannot be

25 doubted.  As to the second factor, with regard to alternative means permitted by the regulations

26 for plaintiff to practice his religion, defendants note that plaintiff is allowed to use his religious

24

1  name in conjunction with his original commitment name on correspondence, that plaintiff is

2  known by CDCR employees under both names, that his medical and central file contain the name

3  "Ashanti" as an ACA, that some of the documents in his central file have both names; and that

4  other inmates use his religious name.  MSJ, p. 7; DUF Nos. 8, 31, 33, 57-58.  Moreover,

5  plaintiff's participation in Muslim practices is not inhibited by the lack of the exclusive use of his

6  religious name in the prison.  Opp., pp. 6-7; DUF Nos. 36-38.

7         As to the third Turner factor, the impact on CDCR of requiring that two names be

8  included as original commitment names for plaintiff for one CDCR number in CDCR records

9  without security being sacrificed, would be significantly adverse, according to defendants.  Opp.,

10  p. 7.  Defendants do demonstrate that the current computer system only accommodates one

11  commitment name per CDCR number, that both OBIS and stand alone PC bases systems at each

12  institution and the Interim Parolee Tracking System would have to be modified and that technical

13  and institutional staff would be significantly burdened.  DUF Nos. 42-49, 52-53.

14         Finally, as to the fourth Turner factor, there does not appear to be an obvious, easy

15  alternative to the prison regulation at issue.  While inmates have a First Amendment right with

16  respect to the use of a religious name, *at least in conjunction with a commitment name*, prisons

17  are not required to alter their filing system to accommodate inmates' new name changes and are

18  only required to recognize legal name changes.  Malik II, 71 F.3d at 728-729 [emphasis added].

19  As defendants have noted their policies do permit plaintiff the use of his religious name in the

20  prison in a number of contexts.  Defendants also accurately observe that the burden is on plaintiff

21  to show that there is an alternative which accommodates his rights fully at de minimis cost to

22  legitimate penological interests.  MSJ, p. 8, citing Turner, 482 U.S. at 91, 107 S. Ct. 2254; Casey

23  v. Lewis, 4 F.3d 1516, 1523 (1993); Standing Deer v. Carlson, 831 F.2d 1525, 1529 (1987),

24  relying on O'Lone, supra, at 350, 107 S. Ct. at 2405.  This plaintiff has not done, and the

25  undersigned is loath to take on the mantle of a knowledgeable prison administrator who can

26  tinker with the system.  Defendants should be granted summary judgment on the ground that

1    CDCR's regulation/policy violates plaintiff's right to the free exercise of his religion, and

2    plaintiff's cross-motion should be denied.

3    *RLUIPA*

4           Section 3 of RLUIPA provides in relevant part, "[n]o government shall impose a

5    substantial burden on the religious exercise of a person residing in or confined to an

6    institution...even if the burden results from a rule of general applicability," unless the government

7    establishes that the burden furthers "a compelling governmental interest," and does so by "the

8    least restrictive means."  42 U.S.C. § 2000cc-1(a)(1)-(2).  RLUIPA defines "religious exercise"

9    to include "any exercise of religion, whether or not compelled by, or central to, a system of

10   religious belief."  42 U.S.C. § 2000cc(5)(7)(A).

11          Under RLUIPA, plaintiff bears the initial burden of going forward with evidence

12   to demonstrate a prima facie claim that defendants' policy which does not permit plaintiff to have

13   his name change used as a dual or exclusive commitment name, but only as an ACA or AKA

14   name, in the prison's records constitutes a substantial burden on the exercise of his religious

15   beliefs.  Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir. 2005), citing 42 U.S.C. § 2000cc-

16   2(b).  If plaintiff establishes the prima facie case of a substantial burden, on which he bears the

17   burden of persuasion, defendant shall bear the burden of persuasion to prove that any substantial

18   burden on plaintiff's exercise of his religious beliefs is both "in furtherance of a compelling

19   governmental interest" and the "least restrictive means of furthering that compelling

20   governmental interest."  Id., quoting 42 U.S.C. § 2000cc-1(a); § 2000cc-2(b).

21          "Although RLUIPA does not define what constitutes a 'substantial burden' on

22   religious exercise, see 42 U.S.C. § 2000cc-5, in the context of a land use suit brought under

23   RLUIPA, we have explained 'for a land use regulation to impose a "substantial burden," it must

24   be "oppressive" to a "significantly great" extent.  That is, a "substantial burden" on "religious

25   exercise" must impose a significantly great restriction or onus upon such exercise,' San Jose

26   Christian Coll. v. City of Morgan Hill, 360 F. 3d 1024, 1034 (9th Cir. 2004)."  Warsoldier v.

26

1   Woodford, 418 F.3d at 995.

2            In the instant case, plaintiff has not met his burden of demonstrating that the

3   defendants' regulation/policy which does not permit him to use his legal name change as his

4   prison commitment name constitutes a substantial burden on the exercise of his religious beliefs.

5   Even though plaintiff was returned to prison with an Abstract of Judgment under the new name,

6   he has not adequately disputed the fact that he was still within the custody of the prison system

7   under his earlier commitment name and had not discharged the earlier commitment.  Even if the

8   earlier commitment has since been discharged during the term he is now serving, plaintiff's

9   explanation contained in his opposition/cross-motion as to the significance of having his African-

10  Muslim name used exclusively (or even dually with his original name, which he does not wish)

11  in his current commitment and in his prison records does not demonstrate, in light of the prison's

12  policies undisputedly permitting plaintiff use of his Muslim name within the institution, in

13  certain records in his prison file, among his fellow inmates, on his correspondence, with visitors,

14  etc., as exhaustively set forth above, how not changing the official commitment name formally

15  imposes a significantly great restriction upon the exercise of his religion.  See Amun v. Culliver,

16  2006 WL 2989212 *1 (S.D. Ala. Oct. 2006).

17           Plaintiff's explanation of his need for the commitment name change does not

18  demonstrate how plaintiff will be impacted in any manner in the practice of his religion by not

19  having this record-changing alteration made.  Plaintiff does not indicate, for example, that he will

20  not be permitted to participate in religious ceremonies, that his access to any religious practice is

21  diminished by the failure of the prison to change his name exclusively or even more prominently

22  in his central file.  He does not show that any use of his original unchanged name subjects him to

23  ostracism from his co-believers, or that he is thereby hampered in any way in navigating the

24  tenets of his religion.  Accordingly, because plaintiff has not met his initial burden, his cross

25  motion for summary judgment as to this claim should be denied and defendant's motion should

26  be granted.

Fourteenth Amendment

### *Due Process*

To the extent that plaintiff seeks to allege a substantive due process violation by defendants in their policy governing an inmate's name on prison records, defendants are correct that any such claim is subsumed within his claim under the First Amendment.  MSJ, p. 12. "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular source of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." Allbright v. Oliver, 510 U.S. 266, 273, 114 S. Ct. 807, 813 (1994), quoting Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989).  Since under the First Amendment, defendant prison officials are explicitly prohibited from unreasonably impinging upon an inmate's right to the free exercise of his religion, plaintiff's claim cannot be properly analyzed as a more generalized due process claim under the Fourteenth Amendment.

Plaintiff claims a protected liberty interest in having his name changed on his prison records because he had his name changed in compliance with state statute, and his new name appears on a number of government-issued documents, as well as on school transcripts and degrees.  Opp./CMSJ, p. 35; Exh. C & Supp. Exh.  As defendants observe, due process rights for prisoners are "generally limited to freedom from restraint" imposing "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

> [W]e recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. See also Board of Pardons v. Allen, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987). But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, see, e.g., Vitek v. Jones, 445 U.S. 480, 493, 100 S.Ct.1254, 1263-1264 (transfer to mental hospital), and Washington, 494 U.S. 210, 221- 222, 110 S.Ct. 1028, 1036-1037 (involuntary administration of psychotropic drugs), nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

1   Sandin v. Conner, 515 U.S. 472, 483-484, 115 S. Ct. 2293, 2300 (1995).   Plaintiff makes no

2   showing that failing to alter his official commitment name on his prison files impacts any

3   freedom from restraint involving an atypical or significant hardship entitling him to

4   constitutional due process protections.   The motion for summary judgment by defendants on this

5   claim should be granted and plaintiff's cross motion denied.

6           *Equal Protection*

7           The Fourteenth Amendment sets forth, inter alia, that "[n]o state shall ... deny to

8   any person within its jurisdiction the equal protection of the laws."   U.S. Const. amend. XIV.

9   Plaintiff claims that his right to equal protection is violated because two other inmates have been

10  permitted to change their commitment names upon second commitments.   Assuming plaintiff's

11  version of events, to withstand summary judgment on this claim he must demonstrate that the

12  two other inmates are similarly situated but have been treated differently from him.   Mayner v.

13  Callahan, 873 F.2d 1300, 1301 (9th Cir. 1989) ("The equal protection clause directs that 'all

14  persons similarly circumstanced shall be treated alike.'").   This he has not done.

15          Defendants concede that plaintiff is serving time for a 1996 felony theft

16  conviction, but maintain that plaintiff could not be discharged from CDCR before 1997.   MSJ, p.

17  11, citing DUF 2 & Cal. Penal Code § 3000(b).   Because the original CDCR number for plaintiff

18  was never discharged and, according to the prison policy, an inmate can have only one original

19  commitment name, it is that name which remains connected to plaintiff's current CDCR number

20  (which is also his original CDCR number, with the new name entered as "also committed as" in

21  the records).   MSJ, p. 11.   Plaintiff's exhibits to his first amended complaint, wherein he includes

22  documentation with regard to inmates Garcia/Slatten[12] and Crisp/Jihad.   FAC, p. 9, Exh. F; Opp./

23  CMSJ, p. 31, Exh. G, Part 2, pp. 39-51.   In the case of inmate Garcia, plaintiff's documentation

24  ────────────

25  [12] Defendants, as plaintiff notes, confuse the argument when they aver that this inmate
    wished to have the name changed to Garcia; the documents show that sought the name to be
26  Slatten.

1 shows that he sought to have his name for his second commitment altered to Slatten. In that

2 case, the CDCR refused to change Garcia's name to Slatten because the name on the original

3 Abstract of Judgment under which he was committed was Garcia.

4 As to inmate Jihad, after having changed his name for religious reasons while he

5 was released from prison, from Crisp, the name under which he had been originally committed,

6 he was subsequently re-committed to prison under his new name. Inmate Jihad's own affidavit

7 demonstrates that he also received a different CDCR number upon the new commitment. FAC,

8 Exh. F, p. 11; Opp./ CMSJ, p. 31, Exh. G, Part 2, pp. 49-50.

9 Plaintiff contends that these individuals were similarly situated but treated

10 differently, but the exhibits do not support that claim, as defendants observe. In the case of

11 Garcia/Slatten, the prison, as they have done with plaintiff, declined to change his commitment

12 name midstream from Garcia to Slatten after he was re-committed under his original

13 commitment name. In the case of inmate Jihad, defendants argue that he is not similarly situated

14 which is proven by the fact that inmate Jihad has a different CDCR number which demonstrates

15 that he discharged his original sentence before being committed again to prison with his new

16 name. Moreover, defendants maintain that this demonstrates that defendants apply the applicable

17 regulation neutrally. The court finds that plaintiff has not demonstrated any violation of his equal

18 protection rights based on his own exhibits because in the first place inmate Garcia was not

19 permitted to have his commitment name changed and in the second, inmate Jihad had fully

20 discharged his original commitment before being returned to prison demonstrating that the

21 applicable regulation was neutrally applied. Defendants' motion for summary judgment on this

22 ground should be granted and plaintiff's motion should be denied.

23 Eighth Amendment

24 "The Eighth Amendment's prohibition against cruel and unusual punishment

25 protects prisoners not only from inhumane methods of punishment but also from inhumane

26 conditions of confinement." Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006), citing

1 Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970 (1994) and Rhodes v. Chapman, 452 U.S.

2 337, 347, 101 S. Ct. 2392 (1981).  Conditions of confinement are often "restrictive and harsh"

3 but "must not involve the wanton and unnecessary infliction of pain" and "must not be devoid of

4 legitimate penological purpose."  Morgan, supra, at 1045 (internal citations omitted).

5        "[A] prison official violates the Eighth Amendment when two requirements are

6 met.  First, the deprivation alleged must be, objectively, 'sufficiently serious' ...Farmer, supra, at

7 834, 114 S. Ct. at 1977.  Second, "[t]o violate the Cruel and Unusual Punishments Clause, a

8 prison officials must have a 'sufficiently culpable state of mind' ... [T]hat state of mind is one of

9 'deliberate indifference' to inmate health or safety."  Id.  The prison official will be liable only if

10 "the official knows of and disregards an excessive risk to inmate health and safety; the officials

11 must both be aware of facts from which the inference could be drawn that a substantial risk of

12 serious harm exists, and he must also draw the inference." Id. at 837, 114 S.Ct. at 1979.

13        Plaintiff claims that defendants have violated his rights under the Eighth

14 Amendment, subjecting him to cruel and unusual punishment, by forcing him to use a name

15 which is a "badge of slavery."  FAC, p. 6.  Plaintiff argues that his former name is emblematic of

16 a time when Africans were enslaved, stripped of their cultural heritage, and forced to use

17 European languages and adopt European names.   Opp./CMSJ, pp. 39-40.  To plaintiff's claim

18 that he is subjected to mental and emotional harm by being forced to endure the use of his former

19 European name by prison staff, defendants contend that such a claim is equivalent to a claim of

20 verbal abuse, which does not rise to the level of a violation of the Eighth Amendment.  MSJ, p.

21 13, citing Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987) (summary judgment upheld

22 on inmate's claim of vulgar language used against him because "'[v]erbal harassment or

23 abuse...is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983.'")

24        Plaintiff counters that courts have recognized that when African Americans adopt

25 the Islamic faith, it is a common practice for them to take Islamic names and to disavow their

26 former Anglo slave-names.  Opp./CMSJ, p. 40, citing Malik I, supra, 16 F.3d at 333, and Malik

1  II, supra, 71 F.3d at 727.  However, plaintiff does not thereby demonstrate how the use of his

2  former or "slave name" constitutes cruel and unusual punishment because in the Malik decisions

3  defendants were not precluded from using plaintiff's former committed name.  Instead, in Malik

4  I, it was determined that the plaintiff was entitled to use his religious name in addition to his

5  former committed name.  Plaintiff's claim on this ground does not rise to the requisite standard

6  to show a violation of his right to be free of cruel and unusual punishment under the Eighth

7  Amendment.  The court finds that defendants' motion for summary judgment should be granted

8  on this ground and plaintiff's cross motion for summary judgment should be denied.

9          Accordingly, IT IS RECOMMENDED that defendants' motion for summary

10  judgment, filed on March 14, 2006, be granted, plaintiff's cross-motion for summary judgment,

11  filed on March 30, 2006, be denied, and judgment be entered for defendants.

12          These findings and recommendations are submitted to the United States District

13  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

14  days after being served with these findings and recommendations, any party may file written

15  objections with the court and serve a copy on all parties.  Such a document should be captioned

16  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

17  shall be served and filed within ten days after service of the objections.  The parties are advised

18  that failure to file objections within the specified time may waive the right to appeal the District

19  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20  DATED: 2/15/07

21                                             /s/ Gregory G. Hollows
                                          _____
22                                             UNITED STATES MAGISTRATE JUDGE

23

24  GGH:009
    asha0474.msj

25

26